IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MARIO A. MORALES,

   Plaintiff,

vs.         No. 07-2018-STA-dkv

K.M. WHITE, et al.,

   Defendants.

ORDER CORRECTING THE DOCKET
ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO EXCEED PAGE LIMIT
SECOND ORDER DIRECTING CLERK TO DOCKET PLAINTIFF'S SUR-REPLY
AND
ORDER DENYING MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(1)
ORDER GRANTING MOTION TO DISMISS PURSUANT TO
FED. R. CIV. P. 12(b)(6)
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
ORDER OF DISMISSAL
ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
AND
NOTICE OF APPELLATE FILING FEE

   On January 8, 2007, Plaintiff Mario A. Morales, Bureau of
Prisons ("BOP") inmate registration number 20561-424, an inmate at
the Federal Correctional Institution in Edgefield, South Carolina,
filed a <u>pro</u> <u>se</u> complaint pursuant to <u>Bivens v. Six Unknown Fed.</u>
<u>Narcotics Agents</u>, 403 U.S. 388 (1974), in connection with his
previous confinement at the Federal Correctional Institution in
Memphis, Tennessee ("FCI-Memphis"). (Docket Entry ("D.E.") 1.)
Plaintiff paid the civil filing fee on February 16, 2007. (D.E. 5.)
United States District Judge J. Daniel Breen issued an order on

August 22, 2007 that, <u>inter alia</u>, dismissed certain claims and parties, pursuant to 28 U.S.C. § 1915A(b)(1) & (2), and directed the Clerk to issue summonses for the remaining defendants and to mail them to Plaintiff, who was responsible for effecting service. (D.E. 12.) The case was transferred to this judge on May 21, 2008. (D.E. 54.)

The remaining defendants were identified in the complaint as FCI-Memphis Assistant Wardens Deborah A. Gonzales and Mr. Heffron; FCI-Memphis Captain Wynder, Jr.; Special Investigations Director Roberts; Special Housing Unit ("S.H.U.") Lieutenants Barton, Brantley, and Martin; Health Services Administrator Franklund; Health Services Doctor Naimey; Health Services P.A./Nurse Gonzalez-Adkins (who is named in the complaint as "Adkins"); Psychologists Dr. Ennis and Dr. Spier (who is named in the complaint as "Spears"); Correctional Officers Simon, Williams, Dillard, and Monix; and Case Manager Carpenter and Counselor Clark, of the "Tenn-Unit." Plaintiff's remaining claims are (I) that Defendants Brantley, Simon, Williams, Dillard, and Monix were deliberately indifferent to Plaintiff's safety by placing him in an exercise cage with another inmate, Ignacio Rodriguez-Moranchel, who stabbed him; (ii) that Defendants Franklin, Naimey, Gonzalez-Adkins, Ennis, and Spier were deliberately indifferent to Plaintiff's serious medical needs by failing appropriately to treat the injuries he sustained in the altercation with Rodriguez-Moranchel; (iii) that Defendants Gonzales, Heffron, Wynder, Roberts, Barton, Carpenter, and Clark retaliated against him for

2

filing grievances; (iv) that Defendants Brantley, Martin, Carpenter, and Clark prevented him from making an unmonitored telephone call to an attorney; and (v) he was exposed to toxic mold.

On January 14, 2008, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(5), and 12(b)(6), or, in the alternative, for summary judgment, supported by a legal memorandum[1] and the declarations of Alecia D. Sankey, Deborah Gonzales, Ann Simon, Dion Franklund, Nahem Naimey, M.D., Emine Gonzalez-Adkins, Stacy Spier, Bryant Ennis, David Carpenter, Paul Clark, and Jack Joiner. (D.E. 41.)[2] On February 7, 2008, Plaintiff filed a response to the motion to dismiss, accompanied by a legal memorandum. (D.E. 45 & 46.)[3] The Court issued an order on September 22, 2008 granting motions by Defendants and Plaintiff for leave to file a reply and a sur-reply, respectively. (D.E. 60.) Defendants'

---

[1]     Pursuant to Local Rule 7.2(e), "[m]emoranda in support of or in opposition to motions shall not exceed twenty pages without prior court approval." Defendants filed a 34-page memorandum without seeking leave. In an order issued on February 6, 2008, Judge Breen admonished Defendants "that future failures to comply with the Local Rules may result in their filings being stricken from the docket <u>sua sponte</u>." (D.E. 43 at 1 n.1.)

[2]     The Clerk is directed to correct the docket to reflect the correct names of Defendants Franklund, Naimey, Adkins, Spier, Ennis, Simon, Carpenter, and Clark.

[3]     On February 1, 2008, Plaintiff filed a motion seeking leave to exceed the page limit in Local Rule 7.2(e) (D.E. 42), and Judge Breen issued an order on February 7, 2008 granting Plaintiff leave to file a 34-page brief because Defendants' brief was 43 pages long (D.E. 43). Plaintiff did not receive this order in time to adjust the length of his brief, as his response to Defendants' motion was received on February 7, 2008 but not docketed until February 11, 2008. That response included a 39-page legal memorandum. The Court AMENDS the order issued on February 7, 2008 to permit Plaintiff to file a 39-page legal memorandum.

reply was filed on September 24, 2008. (D.E. 61.) The Clerk is directed, <u>for the second time</u>, to file Plaintiff's sur-reply.

The facts relevant to these motions are as follows:[4]

1.  On June 15, 2004, the BOP designated Plaintiff to FCI-Memphis. (Declaration of Alecia D. Sankey, dated Jan. 8, 2008 ("Sankey Decl."), ¶ 4 & Ex. A) (D.E. 41-3).)[5]

2.  On February 6, 2006, Plaintiff was placed in the Administrative Detention ("AD") section of the Special Housing Unit ("SHU") at FCI-Memphis. On March 23, 2006, he was returned to the general population.

---

[4]     The Court's task in evaluating Defendants' motion for summary judgment is complicated by Plaintiff's failure to comply with Local Rule 7.2(d)(3), which provides that "the opponent of a motion for summary judgment who disputes any of the material facts upon which the proponent has relied pursuant to subsection (2) above shall respond to the proponent's numbered designations, using the corresponding serial numbering, both in the response and by affixing to the response copies of the precise portions of the record relied upon to evidence the opponent's contention that the proponent's designated material facts are at issue." Plaintiff has responded to portions of Defendants' statement of undisputed facts, but he has not attached, or cited, specific portions of the record. Nonetheless, the Court has attempted, by examining the complaint, which was sworn to under penalty of perjury, to discern the extent to which Plaintiff is able to dispute the proposed factual findings submitted by Defendants. In that regard, Plaintiff's verified complaint is the functional equivalent of an affidavit. <u>Smith v. Campbell</u>, 250 F.3d 1032, 1036 (6th Cir. 2001); <u>Weberg v. Franks</u>, 229 F.3d 514, 526 n.14 (6th Cir. 2000). Attachment B to the complaint, entitled "Official Statement of June 8, 2006 Assault," is signed by Morales and states that "[t]his is my Officail [sic] Statement of the events of June 8, 2006, I swear under penalty of perjury that the above is true to the best of my knowledge." (D.E. 1 at 17.) The Court will assume, for purposes of this motion, that that verification substantially complies with 28 U.S.C. § 1746 and will consider that Statement. The amendment filed on April 23, 2007 (D.E. 7) was not sworn to under penalty of perjury and, therefore, cannot be considered as evidence. Exhibit B to that motion (<u>id.</u> at 16-21) will be considered but, for the reasons discussed <u>infra</u>, Exhibit C does not appear to be admissible in its present form.

Plaintiff's memorandum in opposition to Defendants' motion contains many factual assertions, but the document is not sworn to under penalty of perjury. Although Plaintiff repeatedly refers to evidence he could offer (D.E. 46 at 4 ("records will show . . . "), 5, 18, 19, 20-22, 24-25), Plaintiff cannot avoid a summary judgment by promising to produce admissible evidence at trial, <u>Cox v. Kentucky Dep't of Transp.</u>, 53 F.3d 146, 149 (6th Cir. 1995) ("Essentially, a motion for summary judgment is a means by which to 'challenge the opposing party to "put up or shut up" on a critical issue.'").

[5]     Plaintiff does not dispute this proposed finding. (D.E. 46 at 15.)

(Declaration of Deborah Gonzales, dated Jan. 8, 2008 ("Gonzales Decl."), ¶ 3 & Att. A) (D.E. 41-4).)[6]

3.     On March 30, 2006, Plaintiff was returned to the SHU. (Gonzales Decl., ¶ 3 & Att. A.)[7]

4.     In early June, 2006, Plaintiff's cell-mate allegedly took mold samples from his cell and sent them to his lawyer. His lawyer, in turn, sent them to Daniel Friedman at American Home Service Company, which conducts mold sampling and laboratory analysis. (D.E. 7 at 15-21.)[8]

5.     On June 8, 2006, Plaintiff was involved in an altercation in the SHU recreation area with inmate Ignacio Rodriguez-Moranchel. Plaintiff sustained numerous puncture wounds. (Declaration of Ann Simon, dated Jan. 8, 2008 ("Simon Decl."), ¶¶ 3-6 (D.E. 41-5); Declaration of Dion Franklund, dated Jan. 7, 2008 ("Franklund Decl."), ¶¶ 5-7 & Att. A (D.E. 41-6); Compl., pp. 7-8; Plaintiff's Official Statement.)[9]

6.     Plaintiff received immediate medical attention. His wounds were all superficial puncture wounds requiring only minor first aid. His wounds were cleaned and bandaged and he received a tetanus shot. It was not

---

[6]     Plaintiff does not dispute this proposed finding. (D.E. 46 at 15.) He complains that the declaration of Defendant Gonzales does not disclose why he was transferred to the SHU (id.), but that fact is not material because the complaint does not assert a claim based on Plaintiff's transfer to, or the failure of Defendants to remove him from, the SHU.

[7]     Plaintiff does not dispute that he was returned to the SHU on March 30, 2006. (D.E. 46 at 15-16.) Defendants also asserted, in their proposed finding, that Plaintiff was believed to have been involved in an altercation in the recreation yard on March 29, 2006. (D.E. 41-2 at 6; see Gonzales Decl., ¶ 4 & Att. B.) Plaintiff strenuously disputes that proposed finding (D.E. 46 at 15-16), although he offers no admissible evidence in support of his position. The reason why Plaintiff was moved to the SHU on March 30, 2006 are not material because the complaint does not assert a claim concerning that placement.

[8]     No party has offered any support for the proposition in the text, and no party has referred to the documents attached to Plaintiff's April 23, 2007 amendment, which appear to document this assertion.

[9]     The declaration of Defendant Simon sets forth the reasons why she contends she, and other FCI-Memphis staff, were not deliberately indifferent to Plaintiff's safety. Plaintiff disputes several factual statements in that declaration (D.E. 46 at 17-18), but his denial is not sworn to under penalty of perjury. Because the failure to protect claim will be dismissed for failure to exhaust, for the reasons discussed infra, it is unnecessary to address this factual dispute.

appropriate to use sutures to close the puncture wounds because such treatment could trap any bacteria in the wound, causing subsequent infection. (Declaration of Nahem Naimey, dated Jan. 7, 2008 ("Naimey Decl."), ¶¶ 3-4, 8, 10 & Att. A (D.E. 41-7); Franklund Decl., ¶¶ 4-7 & Atts. A & B.)[10]

7. Following the incident and during the remainder of his time at FCI-Memphis, Plaintiff received frequent medical attention. (Naimey Decl., ¶¶ 4-6 & Att. A.) Staff addressed his complaints of pain by prescribing pain killers. An x-ray was ordered and revealed no bone or joint abnormality. (Id., Att. B.) There was no evidence of nerve damage. (Naimey Decl., ¶ 5.)[11]

8. Following the June 8, 2006 incident, Plaintiff was seen four times by an FCI-Memphis psychologist. On June 13, 2006, he met with Dr. Spier and indicated he felt anxiety when he was on the recreation yard the day before. He further indicated that he was able to conquer his anxiety and face his fear and that his symptoms of anxiety abated. Dr. Spier found no acute symptoms or concerns that warranted immediate or further attention at that time. She indicated she could bring him some literature about anxiety. (Declaration of Stacy Spier, dated Jan. 8, 2006 ("Spier Decl."), ¶ 5 & Ex. A.)[12]

---

[10] In his memorandum, Plaintiff concedes that he "received medical attention in the form of stopping the bleeding, heavy bandages [sic], a motrin and tetnus [sic] shot." (D.E. 46 at 18; see also id. at 19.) In his "Official Statement," Plaintiff states that he "was bleeding profusely, so [he] was taken to the SHU medical room and treated for numerous stab wounds. [He] asked to be taken to the hospital but after [he] was cleaned up and the bleeding was under control, [he] was put back into [his] cell." (D.E. 1 at 17.) Plaintiff has not submitted any admissible evidence that the immediate treatment of his injuries was medically inappropriate.

[11] Plaintiff asserts that he has suffered permanent nerve damage. (D.E. 46 at 19-20.) The only evidence for that assertion is a doctor's report, dated March 29, 2007, that does not appear to support Plaintiff's position. (Id. at 59.)

[12] In his "Official Statement," Plaintiff does not address his psychological distress arising from the June 8, 2006 incident. In his memorandum, Plaintiff complains about the number of requests he had to make before he was seen by Dr. Spier (D.E. 46 at 20-21, 23), but he does not dispute that he was given an appointment on June 13, 2006. He has come forward with no admissible evidence that the care provided by Defendant Spier and FCI-Memphis staff for his psychological distress was medically inappropriate. He objects to the title of the book Defendant Spier gave him, Anxiety for Dummies (D.E. 1 at 10), but he does not address whether the content of the book appropriately addressed his psychological issues.

9. Plaintiff made several complaints of numbness or tingling in his left hand. Examinations revealed that on June 13, 2006 and June 23, 2006, Plaintiff had a full range of motion ("FROM") and was able to grip. (Naimey Decl., ¶¶ 4, 6 & Att. A.) He did not complain of any respiratory distress on either occasion and his vital signs were good. On June 13, 2006, his blood pressure was 120/75, his respiration rate was 16 breaths/minute, and his pulse rate was 76 beats/minute. (Declaration of Emine Gonzalez-Adkins, dated Jan. 8, 2008 ("Gonzalez-Adkins Decl."), ¶¶ 5-6 & Att. A (D.E. 41-8).) On June 12, 2006, his blood pressure was 120/80 and his respiration and heart rate remained unchanged. (Id., Att. A.)[13]

10. On June 26, 2006, Plaintiff filed a administrative remedy complaining of black mold in the SHU. (Sankey Decl., ¶ 11 & Att. E.) He was informed that staff were aware of the presence of mold, that it had been tested and found to be non-toxic, and that steps were being taken to eradicate it. (Id.) Specifically, staff used an enzyme cleaner in the cells, repainted the cells, then returned inmates to these cells. (Id.; see also Declaration of Jack Joiner, dated Jan. 8, 2008 ("Joiner Decl."), ¶¶ 3-7.)[14]

11. On June 29, 2006, Dr. Ennis met with Plaintiff as part of his SHU rounds and monthly review of inmates in SHU. He noted no overt symptoms of mental illness and found Plaintiff to be adjusting adequately to his SHU placement. (Declaration of Bryant Ennis, dated Jan. 7, 2008 ("Ennis Decl."), ¶ 5 & Att. A (D.E. 41-10).)[15]

12. On July 19, 2006, Plaintiff was seen by Physician's Assistant Gonzalez-Adkins. He complained

---

[13]    Plaintiff has not responded to this proposed finding.

[14]    In his memorandum, Plaintiff asserts that the expert consulted by the attorney for his cellmate responded to FCI-Memphis's report "with their own sworn statement that the Institution was wrong and knowingly endangering the lives of prisoners." (D.E. 46 at 17.) Plaintiff is presumably referring to Exhibit C to his April 23, 2007 amendment (D.E. 7 at 22-23), which appears to be an unsigned facsimile message criticizing the conclusions reached by FCI-Memphis about the mold. It is unnecessary to resolve the factual dispute at this point, because Defendants' proposed factual finding only concerns what FCI-Memphis officials told Plaintiff and the steps that were taken to address the mold.

[15]    Plaintiff does not dispute this proposed finding, other than to complain about the number of requests he made to see Dr. Ennis. (D.E. 46 at 23; see also D.E. 1 at 10.) Plaintiff has not presented any admissible evidence that the treatment provided for his psychological distress was medically inappropriate.

about his left arm, indicating he had a shooting pain from the elbow to his finger and sometimes numbness to his left finger. (Gonzalez-Adkins Decl., Att. A.) He did not complain of any respiratory distress or migraine headaches at that time. (Id.) He had a full range of motion in his left hand. He was informed that his request for consultation on his hand would go to the Utilization Review Committee and he would be informed whether he was approved for an Electromyography ("EMG"). (Id.)[16]

13. After continued monitoring, staff at the Utilization Review Committee meeting on July 20, 2006, determined that it would be appropriate to schedule an outside medical trip so that Plaintiff could undergo an EMG to assess the muscles and nerves in his hand. (Naimey Decl., ¶ 6 & Att. C.) Except for emergency situations, FCI-Memphis staff do not have any control over when inmates will be seen by outside hospitals. (Id., ¶ 6.) Just as others in the community, such appointments must be made according to the resources of the medical institution in question. Before Plaintiff could be scheduled for an appointment, he was transferred. (Id.)[17]

14. On July 28, 2006, Dr. Ennis conducted another SHU review and again found no problems or concerns warranting immediate or further intervention. (Ennis Decl., ¶ 5 & Att. B.)[18]

15. On August 4, 2006, Dr. Spier met with Plaintiff. She noted that she had provided him with reading materials and informed him that his situation did

_____

[16] Plaintiff does not address this proposed finding.

[17] Plaintiff does not specifically dispute this proposed finding, other than to question how there could be no evidence of nerve damage if he was approved for an EMG. (D.E. 46 at 20.)

In his memorandum, Plaintiff asserts that, after his transfer to a BOP facility in South Carolina, he "was finally seen by the EMG Testing Specialist on March 29, 2007 (Dr. Kamel at the Aiken Regional Hospital) . . . and Dr. Kamel assured the Plaintiff that the staff at FCI Memphis waited to [sic] long for this testing, because now [the nerve damage to his left hand] was permanent." (Id.) Attached to Plaintiff's memorandum is an EMG Report, dated March 29, 2007, that does not appear to support Plaintiff's position. (Id. at 59.)

[18] Plaintiff did not specifically respond to this proposed finding, although he has complained about the difficulty he has had in obtaining an appointment with Dr. Ennis. See supra p. 7 n.15. He also does not address the statement in Dr. Ennis' report that "the inmate denied any complaints or concerns." (Ennis Decl., Att. B.)

not require transfer to a medical facility because he did not have acute needs. Dr. Spier further noted that Plaintiff only required routine monitoring. (Spier Decl., ¶ 6 & Att. B.)[19]

16. On August 16, 2006, Plaintiff was again seen by Physician's Assistant Gonzales-Adkins. He complained of periodic pain in his left arm but did not mention any numbness. He did not complain of headaches or any respiratory distress. His blood pressure was 110/80 and his respiration rate was 16/minute. He was informed that he had been scheduled for the EMG. (Gonzalez-Adkins Decl., ¶ 7 & Att. A.)[20]

17. On August 21, 2006, Plaintiff was transferred from FCI-Memphis to FCI-Edgefield in South Carolina, another medium security institution. (Sankey Decl., ¶ 4 & Att. A.) This was an appropriate transfer because Plaintiff, although low security level, had a Public Safety Factor of greatest offense severity. Although Plaintiff currently is a low security inmate, he maintains the Public Safety Factor and is therefore housed in a medium security level institution. (Declaration of Davie Carpenter, dated Jan. 7, 2008 ("Carpenter Decl."), ¶ 5 & Att. A.)[21]

---

[19] Plaintiff did not respond to this proposed finding.

[20] Plaintiff did not respond to this proposed finding.

[21] Mr. Carpenter explained the reason for Plaintiff's custody level as follows:

I deny that I incorrectly scored inmate Morales thereby prohibiting him from being transferred to a lower security level facility. [Inmate Morales'] custody classification form . . . reveals that although he scores out as a "low" security inmate, there are public safety factors that currently keep him from being transferred to a low security facility. First, his offense, which includes racketeering, possession of a firearm and a drug offense, is considered a "greatest severity" offense . . . . Second, the offense length, is also a public safety factor. Based on these two public safety factors, the Bureau of Prisons has determined it is more appropriate that he be housed in a medium security institution. Although he has been at FCI, Edgefield for over a year now, that institution has still scored him with public safety factors, as we did at FCI, Memphis.

(Davies Decl., ¶ 5.) In his response, Plaintiff asserts that his case manager "scored Plaintiff correctly" and "guaranteed" that, if he went 18 months with clear conduct, he would be transferred closer to his home in Chicago. (D.E. 46 at 23-24.) Plaintiff has presented no admissible evidence to support these

(continued...)

19. Plaintiff has filed numerous administrative remedies while incarcerated with the BOP. (Sankey Decl., ¶ 6 & Att. B.)[22]

22. Plaintiff did exhaust his administrative remedies by filing appropriately at all three levels complaining about his security designation and custody classification score and how it affected his ability to transfer to a low security facility. (Sankey Decl., Att. H.)

23. Plaintiff exhausted his administrative remedies with regard to mold, by filing appropriately at all three levels complaining about the alleged mold in the Special Housing Unit and its impact on him. (Sankey Decl., Att. E.)

23A. Plaintiff exhausted his administrative remedies as to his allegation that Defendants Franklund, Naimey, Spier, and Ennis failed to provide proper medical care and psychological counseling. (D.E. 41-2 at 16; see Sankey Decl., Att. G.)

Defendants first argue that Plaintiff's unexhausted claims should be dismissed.[23] Pursuant to 42 U.S.C. § 1997e(a), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a

---

[21]    (...continued)
assertions, and he did not respond to Defendant Carpenter's sworn statement that FCI-Edgefield "scored him with public safety factors."

[22]    The Court has omitted several of the proposed factual findings submitted by Defendants concerning exhaustion. Those matters will be addressed infra, in connection with the exhaustion issue.

    Plaintiff "has filed ninety-four (94) administrative remedies as of January 4, 2008." (Sankey Decl., ¶ 6 & Att. B.) Plaintiff made "thirty-four (34) . . . remedy submissions from February 1, 2006, through February 1, 2007. Of the 34 remedies filed during this time frame, five are related to claims Mr. Morales has raised in his current litigation before the court." (Id., ¶ 7 & Att. C.)

[23]    Defendants also argue that the case should be dismissed for insufficient service of process. (D.E. 41-2 at 32-33.) In an order issued on April 29, 2008, Judge Breen notified Plaintiff that Defendants had not been properly served and directed him to file a motion seeking the home addresses of Defendants (D.E. 50), which he did on May 12, 2008 (D.E. 51). That motion is pending. Because the case will be dismissed for the reasons stated infra, it is unnecessary to issue a subpoena for Defendants' home addresses.

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." In order to exhaust his administrative remedies, a prisoner must adhere to the institutional grievance policy, including any time limitations, Woodford v. Ngo, 548 U.S. 81 (2006), and must pursue all avenues of appeal, Thomas v. Woolum, 337 F.3d 720, 726-27 (6th Cir. 2003); Freeman v. Francis, 196 F.3d 641, 645 (6th Cir. 1999); Wright v. Morris, 111 F.3d 414, 417 n.3 (6th Cir. 1997). Furthermore, § 1997(e) requires the prisoner to exhaust his administrative remedies before filing suit and, therefore, he cannot exhaust those remedies during the pendency of the action. Freeman, 196 F.3d at 645. "[F]ailure to exhaust is an affirmative defense under the PLRA." Jones v. Bock, 127 S. Ct. 910, 921 (2007).

The BOP has adopted an administrative remedy program, 28 C.F.R. §§ 542.10-542.19, that is applicable to Bivens actions. See, e.g., Robinson v. Young, 20 F. App'x 476, 477 (6th Cir. 2001); Barksdale v. Rauschel, No. 99-2233, 2000 WL 1434492, at *1 (6th Cir. Sept. 18, 2000). Before filing a grievance, "an inmate shall attempt to first present an issue of concern informally to staff, and staff shall attempt to informally resolve the issue before the inmate submits a Request for Administrative Remedy." 28 C.F.R. § 542.13(a).[24] If the dispute cannot be resolved informally, the

_____

[24] In his response to Defendants' motion, Plaintiff asserts that the "initial submission of a 'cop-out'" is the first step in the BOP administrative remedy process. (D.E. 46 at 24.) Plaintiff does not define the term "cop-out," but he is presumably referring to Inmate Request to Staff forms, several of which
(continued...)

inmate must file a Request for Administrative Remedy. The procedure

for doing so is as follows:

(1) The inmate shall obtain the appropriate form from CCC staff or institution staff (ordinarily, the correctional counselor).

(2) The inmate shall place a single complaint or a reasonable number of closely related issues on the form. If the inmate includes on a single form multiple unrelated issues, the submission shall be rejected and returned without response, and the inmate shall be advised to use a separate form for each unrelated issue. For DHO and UDC appeals, each separate incident report number must be appealed on a separate form.

(3) The inmate shall complete the form with all requested identifying information and shall state the complaint in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8 ½″ by 11″) continuation page. The inmate must provide an additional copy of any continuation page. The inmate must submit one copy of supporting exhibits. Exhibits will not be returned with the response. Because copies of exhibits must be filed for any appeal (see § 542.15(b)(3)), the inmate is encouraged to retain a copy of all exhibits for his or her personal records.

(4) The inmate shall date and sign the Request and submit it to the institution staff member designated to receive such Requests (ordinarily a correctional

---

[24]    (...continued)
are attached to the complaint. (D.E. 1 at 25-27.) It appears, however, that the correct document for initiating an informal attempt at resolution is entitled "REQUEST FOR ADMINISTRATIVE REMEDY: Attempt at Informal Resolution," an example of which is attached to the complaint. (Id. at 24; see also Sankey Decl., Att. E (D.E. 41-3 at 40).)

Twenty-eight C.F.R. ¶ 542.13(a) further provides that "[e]ach Warden shall establish procedures to allow for the informal resolution of inmate complaints." Defendants have submitted an Institution Supplement that states, in pertinent part, that "[t]o informally resolve issues, staff will complete the Attempt at Informal Resolution form." (D.E. 61-2 at 1.) The Institutional Supplement is not conclusive, however, because it is dated no earlier than April 20, 2007, after Plaintiff left FCI-Memphis. (The document may be even more recent, as it purports to cancel a previous Institution Supplement, dated May 31, 2007. (Id. at 1.)) Even if it were assumed that the various informal means of complaining that Plaintiff cites satisfy the informal resolution step in the grievance process, Plaintiff still must comply with the time limit in 28 C.F.R. § 542.14(a). See infra p. 13.

counselor). CCC inmates may mail their Requests to the CCM. Id., § 542.14(c).[25] "The deadline for completion of informal resolution and submission of a formal written Administrative Remedy Request, on the appropriate form (BP-9), is 20 calendar days following the date on which the basis for the Request occurred." Id., § 542.14(a).[26] The warden has the initial responsibility for responding to grievances. 28 C.F.R. § 542.11(a).

---

[25] An inmate may bypass the submission of a grievance at the institutional level, and proceed directly to the regional level, if the grievance involves a sensitive issue:

> If the inmate reasonably believes the issue is sensitive and the inmate's safety or well-being would be placed in danger if the Request became known at the institution, the inmate may submit the Request directly to the appropriate Regional Director. The inmate shall clearly mark "Sensitive" upon the Request and explain, in writing, the reason for not submitting the Request at the institution. If the Regional Administrative Remedy Coordinator agrees that the Request is sensitive, the Request shall be accepted. Otherwise, the Request will not be accepted, and the inmate shall be advised in writing of that determination, without a return of the Request. The inmate may pursue the matter by submitting an Administrative Remedy Request locally to the Warden. The Warden shall allow a reasonable extension of time for such a resubmission.

Id., § 542.14(d)(1).

[26] The regulations specify the circumstances in which this deadline can be extended:

> Where the inmate demonstrates a valid reason for delay, an extension in filing time may be allowed. In general, valid reason for delay means a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that a response to the inmate's request for copies of dispositions requested under § 542.19 of this part was delayed.

Id., § 542.14(b).

13

An inmate who is not satisfied with the warden's response may appeal to the BOP's regional director "within 20 calendar days of the date the Warden signed the response" and, thereafter, to the general counsel of the BOP "within 30 calendar days of the date the Regional Director signed the response." Id. § 542.15(a). The procedure for an appeal is as follows:

> (1) Appeals to the Regional Director shall be submitted on the form designed for regional Appeals (BP-10) and accompanied by one complete copy or duplicate original of the institution Request and response. Appeals to the General Counsel shall be submitted on the form designed for Central Office Appeals (BP-11) and accompanied by one complete copy or duplicate original of the institution and regional filings and their responses. Appeals shall state specifically the reason for appeal.

> (2) An inmate may not raise in an Appeal issues not raised in the lower level filings. An inmate may not combine Appeals of separate lower level responses (different case numbers) into a single Appeal.

> (3) An inmate shall complete the appropriate form with all requested identifying information and shall state the reasons for the Appeal in the space provided on the form. If more space is needed, the inmate may use up to one letter-size (8½" x 11") continuation page. The inmate shall provide two additional copies of any continuation page and exhibits with the regional Appeal, and three additional copies with an Appeal to the Central Office (the inmate is also to provide copies of exhibits used at the prior level(s) of appeal). The inmate shall date and sign the Appeal and mail it to the appropriate Regional Director, if a Regional Appeal, or to the National Inmate Appeals Administrator, Office of General Counsel, if a Central Office Appeal.

28 C.F.R. § 542.15(b). According to the regulations, "response shall be made by the Warden . . . within 20 calendar days; by the Regional Director within 30 calendar days; and by the General Counsel within 40 calendar days." Id. § 542.18. "If the inmate does not receive a response within the time allotted for reply,

14

including extension, the inmate may consider the absence of a response to be a denial at that level." Id.

To the extent Defendants' motion is brought under Fed. R. Civ. P. 12(b)(1) it is without merit. The Sixth Circuit has construed the Supreme Court's decision in Jones v. Bock to mean that failure to exhaust under the PLRA is not a jurisdictional defect. Owens v. Keeling, 461 F.3d 763, 768 (6th Cir. 2006); see also Jones v. Bock, 127 S. Ct. 910, 919 (2007). Defendants' motion to dismiss the complaint for failure to exhaust, pursuant to Fed. R. Civ. P. 12(b)(1), is DENIED.

Defendants also argue that the unexhausted claims should be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim on which relief may be granted. A motion to dismiss under Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of the complaint. Riddle v. Egensperger, 266 F.3d 542, 550 (6th Cir. 2001). Although this Court previously followed the Sixth Circuit rule that allowed the sua sponte dismissal of complaints where prisoners did not plead and prove exhaustion, the decision in Jones v. Bock, 127 S. at 921, invalidated that practice because "inmates are not required to specifically plead or demonstrate exhaustion in their complaints." See also Baker v. Mukasey, No. 07-5234, 2008 WL 2622659, at *2 (6th Cir. July 1, 2008); Dotson v. Correctional Med. Servs., 253 F. App'x 536, 537 (6th Cir. 2007) (per curiam).

An affirmative defense may also be asserted in a Rule 12(b)(6) motion. See Jones, 127 S. Ct. at 920-21. In this case, however, Defendants do not contend that Plaintiff's failure to

exhaust appears on the face of his complaint. By submitting matters outside the pleadings, the motion is properly considered under the summary judgment standard. <u>See</u> Fed. R. Civ. P. 12(d).[27] Therefore, Defendants' motion to dismiss the unexhausted claims pursuant to Fed. R. Civ. P. 12(b)(6) is DENIED.

Summary judgment is appropriate "if . . . there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). As the Supreme Court has explained:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986) (citation omitted).

Under Fed. R. Civ. P. 56(e)(2), "[w]hen a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for

---

[27]    In this case, Plaintiff is on notice that Defendants' motion can be treated as a motion for summary judgment because the title of the motion asked, "in the alternative for summary judgment." (D.E. 41 at ,1

16

trial." In considering a motion for summary judgment, "the evidence as well as the inferences drawn therefrom must be read in the light most favorable to the party opposing the motion." <u>Kochins v. Linden-Alimak, Inc.</u>, 799 F.2d 1128, 1133 (6th Cir. 1986); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-88 (1986) (same).[28]

A genuine issue of material fact exists "if the evidence [presented by the non-moving party] is such that a reasonable jury could return a verdict for the non-moving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>see also</u> <u>id.</u> at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict[.]"); <u>Matsushita</u>, 475 U.S. at 586 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.") (footnote omitted). The Court's function is not to weigh the evidence, judge

---

[28]    Rule 56(e)(1) sets forth in detail the evidentiary requirements applicable to a summary judgment motion:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

credibility, or in any way determine the truth of the matter, however. <u>Liberty Lobby</u>, 477 U.S. at 249. Rather, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Id.</u> at 251-52.

Moreover, Fed. R. Civ. P. 56(f) provides as follows:

If a party when opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) deny the motion;

(2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or

(3) issue any other just order.

"Beyond the procedural requirement of filing an affidavit, Rule 56(f) has been interpreted as requiring that a party making such a filing indicate to the district court its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." <u>Cacevic v. City of Hazel Park</u>, 226 F.3d 483, 488 (6th Cir. 2000); <u>see also</u> <u>Good v. Ohio Edison Co.</u>, 149 F.3d 413, 422 (6th Cir. 1998); <u>Plott v. General Motors Corp.</u>, 71 F.3d 1190, 1196-97 (6th Cir. 1995). Moreover, the Sixth Circuit has held that, unless the nonmoving party files a Rule 56(f) affidavit, a district court cannot decline to consider the merits of a summary judgment motion on the ground that it is premature. <u>Wallin v. Norman</u>, 317 F.3d 558, 564 (6th Cir. 2003).

In this case, Plaintiff did not argue that he needs discovery to respond to Defendants' summary judgment motion, and he

did not file a Rule 56(f) affidavit.[29] Therefore, the Court will address this motion on the merits.

Defendants first contend that Plaintiff did not exhaust his administrative remedies with regard to his claim that Defendants Brantley, Simon, Williams, Dillard, and Monix failed to protect him from the June 8, 2006, assault by inmate Rodriguez-Moranchel. (D.E. 41-2 at 10, 16.) On April 30, 2006, more than two months before the assault, Plaintiff filed a Request for Administrative Remedy: Attempt at Informal Resolution in which he complained that he was being held in the SHU for no reason, and he asked to be released back to the compound. (Sankey Decl., Ex. E (D.E. 41-3 at 29).) Plaintiff filed a Request for Administrative Remedy on that same issue on May 7, 2006 (id. at 30), which was assigned Case Number 413530 and denied by the warden on June 29, 2006 for the following reasons:

> This is in response to your Request for Administrative Remedy in which you request to be released from Administrative Detention and returned to the compound at FCI Memphis, Tennessee.
>
> During an investigation, it was revealed you were involved in an altercation that occurred on the institution recreation yard on March 29, 2006. This was confirmed with a recent incident in which you were involved in a fight on the Special Housing Unit recreation yard. Although, you are not being charged with a prohibited act, it was recommended that you remain in the Special Housing Unit pending an Adjustment Transfer

---

[29]    On April 19, 2008, Defendants filed a motion to stay discovery pending resolution of this motion because they have filed a motion asserting the defense of qualified immunity. (D.E. 48.) In his response to the motion, filed on May 13, 2008, Plaintiff characterized the motion as a "stall tactic" and argued that Defendants are not entitled to qualified immunity, but he did not argue that he needed discovery in order to respond to the motion for summary judgment. (D.E. 53.)

to another institution more suitable to your security needs.

Based on the following, your request is denied.

(<u>Id.</u> at 31.)

In his Regional Administrative Remedy Appeal, dated June 30, 2006, Plaintiff mentioned the incident of June 8, 2006 only as it pertained to his request to be returned to general population:

> The reason for my appeal is because I was never involved in an altercation on the institution rec. yard on March 29, 2006. I maintain that I was not even present for the altercation between inmates Ignacio Rodriguez #06586-030 and Jose Gonzalez-Ramirez #17635-076. They were charged accordingly. Now as for the "fight" in the SHU rec yard #2, which "confirmed" my participation on March 29, I didn't fight anyone. Attached to this document is a copy of my <u>official</u> <u>statement</u> (Exhibit #1) for that incident. My fighting shot was expunged by the DHO on June 20, because she agreed that I was assaulted. For the reasons stated on my BP-8 and BP-9, I still do <u>not wish to be transferred</u>, <u>I'm fine at this institution</u>. The person who assaulted me goes home in 2007, I go home in 2024. My next Unit Team is this month, I have 7 points and that is scheduled to go down to 5.

(<u>Id.</u> at 32 (emphasis in original); <u>see also</u> <u>id.</u> at 33-34.) On October 25, 2006, the Regional Director of the BOP's Mid-Atlantic Regional Office denied Plaintiff's appeal for the reasons stated in the warden's response. (<u>Id.</u> at 35.)

In his appeal to the BOP General Counsel, Plaintiff substantially broadened the scope of the issues under consideration:

> I am appealing because I have been transfered [sic] vidictively [sic] further away from my wife and children in Chicago. I was told I locked up in the SHU for my protection, later that change to "under investigation." I never fought anyone on the yard on March 29, 2006. On June 8, 2006 I was brutally attacked and stabbed 12 times by my separate-tee [sic]. He was mistakenly put in the

same rec cage as me by C.O. Simon. I suffered serious
injuries and consequently I began filing Administrative
Remedies. I was charged with Fighting, but the DHO
expunged my shot do [sic] to the video and other relevant
evidence. I was told charges were pending against inmate
Ignacio Rodriguez #08586-030 for the attempt on my life.
I did not want to be transfered [sic] from Memphis, but
I was. For reasons provided with this document I wish to
be housed at a low level institution in my own Region, I
want charges brought against inmate Rodriguez, I want
full treatment for my injuries and compensation for my
pain and suffering.

(*Id.* at 36.) On February 6, 2007, the Administrator of National

Inmate Appeals denied Plaintiff's appeal, concluding that "we do

not find justification to reverse the decisions made." (*Id.* at 37.)

That decision addressed Plaintiff's placement in administrative

detention and his transfer away from FCI-Memphis. In response to

Plaintiff's request for compensation for his pain and suffering,

Plaintiff was referred to the procedure for exhausting a claim

under the Federal Tort Claim Act. (*Id.*) There was no discussion of

the alleged failure to protect Plaintiff.

Plaintiff's cursory mention of the failure to protect in

the appeal to the BOP General Counsel is insufficient to exhaust

that claim because Plaintiff did not comply with the BOP's

procedural requirements for complete exhaustion. Specifically,

Plaintiff did not present the issue to staff for informal

resolution, as required by 28 C.F.R. § 542.542.13(a), and he did

not file a Request for Administrative Remedy at the institutional

level, as required by 28 C.F.R. § 542.14. Plaintiff also did not

follow the procedure for bypassing the institutional level for

grievances involving sensitive matters. <u>Id.</u>, § 542.14(d)(1).[30] The fact that the assault was mentioned in the appeal to the BOP General Counsel is insufficient because Plaintiff bypassed the previous levels and because "[a]n inmate may not raise in an Appeal issues not raised in the lower level filings." <u>Id.</u>, § 542.15(b)(2).

Even if Plaintiff is correct that his "cop-outs" were attempts at informal resolution (D.E. 46 at 24-25), <u>see</u> <u>supra</u> pp. 11-12 n.24, the only "cop-outs" submitted by Plaintiff concerning the assault are dated August 8, 2006 and July 27, 2006 (D.E. 1 at 25-26), well beyond the twenty (20) day limitation period for completion of the informal resolution and submission of a Request for Administrative Remedy. 28 C.F.R. § 542.14(a).[31] Neither of these "cop-outs" specifically alleges that any FCI-Memphis employee failed to protect him from inmate Rodriguez-Moranchel.[32]

---

[30] In his complaint, Plaintiff alleges that, on an unspecified date, he sent his "Official Statement" to the Regional Director "with a 'sensitive-10.'" (D.E. 1 at 9.) Plaintiff has not attached a copy of that document and, in response to the motion for summary judgment, Plaintiff has not disclosed how the Regional Director responded to his attempt to bypass the institutional level of the grievance process. This assertion is insufficient to create a triable issue of fact. <u>Jackson v. Walker</u>, Civil Action No. 6:07-230-DCR, 2008 WL 559693, at *7-*8 (E.D. Ky. Feb. 27, 2008)

[31] Plaintiff complains that he did not receive timely requests to some of his requests (D.E. 46 at 24-25), but he overlooks the fact that the regulations permit an inmate to treat a failure to respond as a denial, 28 C.F.R. § 542.18. Plaintiff also has presented no evidence that he filed any timely Request for Administrative Remedy on the failure to protect issue that was improperly handled.

[32] The fact that Plaintiff may have communicated informally with Defendants and others, through "cop-outs," sick call requests, letters, and personal appeals, does not excuse his failure to follow the BOP's grievance process. <u>Jackson v. Walker</u>, 2008 WL 559693, at *10 (the fact that BOP officials had knowledge of a claim is insufficient to satisfy § 1997e(a). This is consistent with Sixth Circuit precedent prior to <u>Woodford v. Ngo</u>. <u>See, e.g.</u>, <u>Shephard v. Wilkinson</u>, 27 F. App'x 526, 527 (6th Cir. 2001) ("While Shephard asserts that he has raised his complaints in numerous letters to prison and
(continued...)

For all the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment on the failure to protect claim, which was asserted against Defendants Brantley, Simons, Williams, Dillard, and Monix.

Plaintiff also failed to exhaust his claim that Defendants Gonzales, Heffron, and Wynder ordered Defendant Brantley to issue Plaintiff a disciplinary write-up for fighting after the June 8, 2006 incident. On or about June 16, 2006, Plaintiff filed an Attempt at Informal Resolution in which he complained that a disciplinary charge for fighting would adversely affect his security classification and asked to be transferred out of the SHU. (Sankey Decl., Ex. D (D.E. 41-3 at 47).) Plaintiff did not assert that Defendant Brantley was ordered to issue Plaintiff a disciplinary write-up to cover up the fact that FCI-Memphis failed to protect Plaintiff from Rodriguez-Moranchel. The write-up was referred to a disciplinary hearing officer, who ordered that it be expunged. On July 7, 2007, Plaintiff filed a Request for Administrative Remedy in which he asked for written verification that the write-up had been expunged and to be transferred out of the SHU. (Id. at 49.) He did not allege that he was given a write-up in order to cover up staff's failure to protect him. The warden

<hr />

[32]      (...continued)
public officials, a prisoner must utilize the formal grievance process provided by the state; he cannot comply with the requirements of § 1997e(a) by informally presenting his claims."); Hewell v. Leroux, 20 F. App'x 375, 377 (6th Cir. 2001); see also Clark v. Beebe, No. 98-1430, 1999 WL 993979, at *2 (6th Cir. Oct. 21, 1999) (district court erred in holding that prisoner had substantially complied with exhaustion requirement by writing a letter to the U.S. Attorney's office that eventually made its way to the warden of plaintiff's prison).

responded on August 30, 2006 that, "[a]lthough the incident report was expunged, it was recommended that you remain in the Special Housing Unit pending an Adjustment Transfer to another institution more suitable to your security needs." (Id. at 48.) Plaintiff did not appeal.

The Court GRANTS Defendants' motion for summary judgment on the claim that Defendants Gonzales, Heffron, and Wynder ordered Defendant Brantley to issue Plaintiff a disciplinary write-up for fighting.

Plaintiff also did not exhaust his claim that, after the assault, he was moved into a cell adjacent to Rodriguez-Moranchel. None of the grievances Plaintiff filed after June 8, 2006 state that any FCI-Memphis staff member continued to house him near Rodriguez-Moranchel. The Court GRANTS Defendants' motion for summary judgment on this issue.

Finally, Plaintiff did not exhaust his claim that Defendants Gonzales, Brantley, Martin, Carpenter, and Clark retaliated against him for filing grievances by transferring him to FCI-Edgefield and that Defendants Brantley, Martin, Carpenter, and Clark interfered with his attempts to contact his attorney. The Court GRANTS Defendants' motion for summary judgment on these issues.

Defendant Franklund contends that he has absolute immunity as a commissioned officer of the public health service. Forty-two U.S.C. § 233(a) states:

The remedy against the United States provided by sections 1346(b) and 2672 of Title 28, or by alternative benefits provided by the United States where the availability of such benefits precludes a remedy under section 1346(b) of Title 28, for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any commissioned officer or employee of the Public Health Service while acting within the scope of his office or employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the officer or employee (or his estate) whose act or omission gave rise to the claim.

Thus, where an individual defendant is a commissioned officer of the Public Health Service acting within the scope of his employment, the plaintiff's only remedy is pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 et seq. Seminario Navarette v. Vanyur, 110 F. Supp.2d 605 (N.D. Ohio 2000). In Cuoco v. Moritsugu, 222 F.3d 99, 109 (2d Cir. 2000), the Second Circuit held that a prison medical director was immune from a Bivens suit under § 233(a) because his "alleged misdeeds related only to his decision, as the principal medical official for the Bureau of Prisons, not to authorize a particular medical treatment for [the plaintiff]." See also Walls v. Holland, No. 98-6506, 1999 WL 993765, at *2 (6th Cir. Oct. 18, 1999); Beverly v. Gluch, No. 89-1915, 1990 WL 67888, at *1 (6th Cir. May 23, 1990); Valdez v. Federal Bur. of Prisons, No. 4:06CV2994, 2007 WL 4510219 (N.D. Ohio Dec. 17, 2007); Davis v. Stine, Civil Action No. 6:06-156-DCR, 2006 WL 3140169, at *6 (E.D. Ky. Oct. 31, 2006); Seminario Navarette, 110 F. Supp.2d at 606-07; Lewis v. Sauvey, 708 F. Supp. 167 (N.D. Ohio 1989).

In his declaration, Defendant Franklund states as follows:

1. I am presently the Health Services Administrator (HSA) at the Federal Correctional Institution ("FCI") in Memphis, Tennessee. I was promoted to my current rank on 10/01/2001, and prior to my assignment here I was assigned to FDC Houston. I have held this position since February, 2006. In addition, <u>I am a commissioned officer of the U.S. Public Health Service with the rank of Lieutenant Commander/O-4. I have been in the U.S. Public Health Service since July, 2000, and have held my current rank since October 1, 2001</u>. I am a licensed Registered Nurse.

2. As the Health Services Administrator at FCI, Memphis I am responsible for planning, implementing, directing, and controlling all aspects of the department's administration, including record-keeping, sanitation, maintenance, personnel, fiscal procurement, and supply, as well as the supervision and direction of ancillary departments, including pharmacy, nursing, laboratory, x-ray, and health records. Further, I am responsible for establishing an effective management system to integrate the needs of the individual patient with current health programs. I also provided administrative supervision and direction to all Health Services staff, except the Clinical Director, including designation of shifts and assignment of general and specific duties. In addition, I am a licensed Registered Nurse and provide direct medical care where appropriate.

Franklund Decl., ¶¶ 1-2 (emphasis added).

Plaintiff has sued Defendant Franklund for (I) failing to provide appropriate treatment for the physical and psychological injuries he sustained in the June 8, 2006 assault and (ii) failing to take action with respect to the mold in the SHU. Plaintiff does not dispute that Defendant Franklund is a commissioned officer of the Public Health Service, that his claims against Franklund arise out of "the performance of medical, surgical, dental, or related

functions," within the meaning of the statute, or that Defendant Franklund was, at all times, acting within the scope of his employment.[33] Plaintiff argues that Defendant Franklund was deliberately indifferent to his serious medical needs (D.E. 46 at 30-33), but he does not address the cases holding that Plaintiff's only remedy for injuries caused by Defendant Franklund is an action against the United States under the FTCA.

Therefore, the Court GRANTS Defendants' motion for summary judgment on the claims against Defendant Franklund because she is immune from suit pursuant to 28 U.S.C. § 233(a).

Although Plaintiff did not exhaust a claim that Defendants Gonzales, Brantley, Martin, Carpenter, and Clark retaliated against him for filing grievances by transferring him to FCI-Edgefield, see supra p. 24, Plaintiff did exhaust his administrative remedies on a claim against Defendants Carpenter and Clark about his security designation and custody classification and how it affected his ability to transfer to a low-security facility,

---

[33]    This is not a case in which the Attorney General is required to certify that Defendant Franklund was acting within the scope of his employment. An action filed in state court may be removed "[u]pon a certification by the Attorney General that the defendant was acting in the scope of his employment at the time of the incident out of which the suit arose[.]" 42 U.S.C. § 233(c). Where, as here, the lawsuit originates in federal court, the statute does not require the Attorney General to certify that the defendant was acting within the scope of his employment.

Similarly, the Westfall Act, 28 U.S.C. § 2679, requires the Attorney General to certify that a federal employee defendant was acting within the scope of his employment with respect to any suit commenced in federal court. See 28 U.S.C. § 2679(d)(1). "The Attorney General's certification provides prima facie evidence that the employee was acting within the scope of employment." RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1142 (6th Cir. 1996). The Westfall Act is inapplicable here because the plaintiff's claims arise under the U.S. Constitution. Id., § 2679(b)(2)(A).

<u>see</u> <u>supra</u> p. 10. These allegations do not state a constitutional claim.

Plaintiff's claim that Defendants Carpenter and Clark did not correctly calculate his security level arises under the Due Process Clause. In general, an inmate does not have a liberty interest in a particular security classification or in freedom from administrative segregation. <u>Olim v. Wakinekona</u>, 461 U.S. 238, 245 (1983); <u>Meachum v. Fano</u>, 427 U.S. 215, 224-25 (1976); <u>Montanye v. Haymes</u>, 427 U.S. 236, 243 (1976); <u>Moody v. Daggett</u>, 429 U.S. 78, 88 n.9 (1976); <u>Newell v. Brown</u>, 981 F.2d 880, 883 (6th Cir. 1992); <u>Beard v. Livesay</u>, 798 F.2d 874, 876 (6th Cir. 1986). Plaintiff also does not have a liberty interest in serving his sentence in a facility near his family. <u>Meachum v. Fano</u>, 427 U.S. 215 (1976); <u>Turnboe v. Fundy</u>, 27 F. App'x 339, 340 (6th Cir. 2001) (inmate's "transfer does not implicate a Fourteenth Amendment liberty interest because a prisoner has no right to be incarcerated in a particular prison"); <u>Geiger v. Prison Realty Trust, Inc.</u>, 13 F. App'x 313, 315 (6th Cir. 2001) ("Geiger failed to state a due process claim based upon his transfer from the WCF to the NFCF. A prisoner has no inherent constitutional right to be confined in a particular prison."); <u>Ward v. Dyke</u>, 58 F.3d 271, 274 (6th Cir. 1995); <u>cf.</u> <u>Olim</u>, 461 U.S. at 245 (noting that "an inmate has no justifiable expectation that he will be incarcerated in any particular prison within a State").[34]

---

[34] Moreover, as Defendants have pointed out, Plaintiff misunderstands the recalculation of his custody classification. (<u>See</u> D.E. 41-2 at 25.) As
(continued...)

The Court GRANTS Defendants' motion for summary judgment on this claim.

Plaintiff's remaining claims arise under the Eighth Amendment, which prohibits cruel and unusual punishment. <u>See generally</u> <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991). An Eighth Amendment claim consists of both objective and subjective components. <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994); <u>Hudson v. McMillian</u>, 503 U.S. 1, 8 (1992); <u>Wilson</u>, 501 U.S. at 298; <u>Brooks v. Celeste</u>, 39 F.3d 125, 127-28 (6th Cir. 1994); <u>Hunt v. Reynolds</u>, 974 F.2d 734, 735 (6th Cir. 1992). The objective component requires that the deprivation be "sufficiently serious." <u>Farmer</u>, 511 U.S. at 834; <u>Hudson</u>, 503 U.S. at 8; <u>Wilson</u>, 501 U.S. at 298.

To satisfy the objective component of an Eighth Amendment claim, a prisoner must show that he "is incarcerated under conditions posing a substantial risk of serious harm," <u>Farmer</u>, 511 U.S. at 834; <u>Stewart v. Love</u>, 796 F.2d 43, 44 (6th Cir. 1982), or that he has been deprived of the "minimal civilized measure of life's necessities," <u>Wilson</u>, 501 U.S. at 298 (quoting <u>Rhodes v. Chapman</u>, 452 U.S. 337, 347 (1981)). The Constitution "'does not mandate comfortable prisons.'" <u>Wilson</u>, 501 U.S. at 298 (quoting <u>Rhodes</u>, 452 U.S. at 349). Rather, "routine discomfort 'is part of

---

[34]    (...continued)
previously stated, <u>see</u> <u>supra</u> p. 9 & n.21, Defendant Carpenter scored Plaintiff's security level as "low," which was the same level he had previously. Both FCI-Memphis and FCI-Edgefield are medium-security facilities, which are appropriate for Plaintiff because he has been assigned two public safety factors, based on the nature of his offenses and the time left to be served on his sentence. While at FCI-Edgefield, Plaintiff was scored with the same public safety factors attributed to him at FCI-Memphis.

the penalty that criminal offenders pay for their offenses against society.'" <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Rhodes</u>, 452 U.S. at 347).

In considering the types of conditions that constitute a substantial risk of serious harm, the Court considers not only the seriousness of the potential harm and the likelihood that the harm will actually occur, but evidence that unwilling exposure to that risk violates contemporary standards of decency, *i.e.*, that society does not choose to tolerate this risk in its prisons. <u>Helling v. McKinney</u>, 509 U.S. 25, 36 (1993). The Supreme Court has also emphasized that prisoners can rarely establish an Eighth Amendment violation from a combination of conditions of confinement that, in themselves, do not rise to the level of a constitutional violation:

> <u>Some</u> conditions of confinement may establish an Eighth Amendment violation "in combination" when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets. . . . To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. <u>Nothing so amorphous as "overall conditions" can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists.</u>

<u>Wilson</u>, 501 U.S. at 304-05 (citations omitted; emphasis added); <u>see also</u> <u>Thompson v. County of Medina, Ohio</u>, 29 F.3d 238, 242 (6th Cir. 1994); <u>Walker v. Mintzes</u>, 771 F.2d 920, 925026 (6th Cir. 1985).

To establish the subjective component of an Eighth Amendment violation, a prisoner must demonstrate that the official acted with the requisite intent, that is, that he had a "sufficiently culpable state of mind." <u>Farmer</u>, 511 U.S. at 834;

Wilson, 501 U.S. at 297, 302-03. The plaintiff must show that the prison officials acted with "deliberate indifference" to a substantial risk that the prisoner would suffer serious harm. Farmer, 511 U.S. at 834; Wilson, 501 U.S. at 303; Helling v. McKinney, 509 U.S. 25, 32 (1993); Woods v. Lecureux, 110 F.3d 1215, 1222 (6th Cir. 1997); Street v. Corrections Corp. of Am., 102 F.3d 810, 814 (6th Cir. 1996); Taylor v. Michigan Dep't of Corrections, 69 F.3d 76, 79 (6th Cir. 1995). "[D]eliberate indifference describes a state of mind more blameworthy than negligence." Farmer, 511 U.S. at 835. Thus,

> [a] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Eighth Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. . . . But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

Id. at 837-38 (emphasis added; citations omitted); see also Garretson v. City of Madison Heights, 407 F.3d 789, 796 (6th Cir. 2005) ("If the officers failed to act in the face of an obvious risk of which they should have known but did not, then they did not violate the Fourteenth Amendment.").

Plaintiff has exhausted a claim that he was exposed to toxic mold while housed in the SHU. See supra p. 10. Defendants contend that the conditions in the SHU did not violate the Eighth Amendment. (D.E. 41-2 at 25-29.) "The circumstances, nature, and duration of a deprivation . . . must be considered in determining whether a constitutional violation has occurred.'" Spencer v. Bouchard, 449 F.3d at 727 (quoting Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir. 2000)). Except for a six-day period, Plaintiff was housed in the SHU from February 6, 2006 until his transfer out of FCI-Memphis on August 21, 2006. See supra pp. 4-5, 9. In an unsworn amendment to the complaint, he contends the SHU was contaminated with black mold. (D.E. 7.)

Exposure to black mold may, in an appropriate case, satisfy the objective component of an Eighth Amendment violation. Compare Board v. Farnham, 394 F.3d 469, 486-87 (7th Cir. 2005) (mold in the ventilation system violates Eighth Amendment) with Causey v. Allison, Civil Action No. 1:08CV155-RHW, 2008 WL 4191746, at *1 (S.D. Miss. Sept. 9, 2008) (no Eighth Amendment violation where prisoner claimed black mold was growing in the shower but "admits that he has had no medical problems resulting from the black mold"); McIntyre v. Phillips, No. 1:07-cv-527, 2007 WL 2986470, at *2-*4 (W.D. Mich. Sept. 10, 2007).

In this case, there is no dispute that some type of mold or mildew was present on some of the walls in the SHU, including one or more walls in Plaintiff's cell. Plaintiff has not submitted an affidavit describing the extent of the mold in the SHU. He has

submitted what purports to be a report from the American Home Services Company, dated June 20, 2006, that analyzed a mold sample that Plaintiff asserts was taken from a wall in his cell (D.E. 7-2 at 16-21),[35] but Plaintiff has not submitted any admissible evidence about the that the sample came from his cell, the chain of custody of the sample, or that the sample is more than an isolated occurrence but, instead, representative of conditions in his cell and throughout the SHU. (See D.E. 41-2 at 27.)[36]

---

[35] The report concluded that the sample contained "significant" particles of "Pithomyces sp. spores and hyphal fragments." (D.E. 7-2 at 16.) The report stated that "we found no report of [Pithomyces] as a human pathogen." (Id. at 17.) Hyphal fragments "[m]ay be an allergen." (Id. at 21.) The report also found "Cladosporium" to be "present." (Id. at 16.) It is a "common allergen." (Id. at 17.) The significance of a finding that mold was "present" was explained as follows:

> "Present" means that these are other spores [that] were frequently present in the sample, typically comprising 20% to 50% of the total fungal concentration observed. They are less likely to be of significance to occupants of the building except when particles named are 1. particularly allergenic or toxic[;] 2. are not commonly found in outdoor air[;] or 3. of other technical significance . . . . The presence of individual or a few spores which may be toxic or allergenic is not normally itself a cause for alarm; however if the building has a history of leaks, water entry, or other hidden moisture problems, the presence of even a few toxic or allergenic spores which are not often found in outdoor air samples may indicate a hidden problem. In these cases further investigation is in order to determine if there is a significant presence elsewhere in the building than from where this sample is taken.

Id. at 19. The report cautioned that, "[u]nless the sample collection was combined with an expert inspection of the building, one cannot be certain of the extent of mold or other particle contamination in a building. Similarly, without an expert inspection one cannot determine if a sample accurately represents all of the molds present in the building." id. at 18.

[36] The Court has not considered the statement in the declaration of Jack Joiner that the mold was tested in 2004 and found not to be toxic (Declaration of Jack Joiner, sworn to on Jan. 8, 2008 ("Joiner Decl."), ¶ 3 (D.E. 41-13) as substantive evidence that the mold was non-toxic because a copy of that report was not submitted. This statement is admissible only as to what FCI-Memphis staff believed about the mold.

Plaintiff also has not submitted any admissible evidence that he suffered any adverse effects from his alleged exposure to mold in the SHU. Plaintiff asserts that the medical staff "diagnosed him with migraine headaches and prescribed him Propranolnol." (D.E. 46 at 37.) Plaintiff does not address the declaration of Dr. Naimey, who states that, "[w]hen he was seen by Health Services Staff, he did not complain of any respiratory distress or migraine headaches he attributed to [exposure to mold]." (Naimey Decl., ¶ 9.) Likewise, Defendant Adkins-Gonzalez states that "I have no recollection of inmate Morales ever complaining of respiratory distress for any reason, and specifically have no recollection of him complaining about such a concern related to black mold in SHU." (Adkins-Gonzalez Decl., ¶ 5; see supra pp. 7-8, 9.) Gonzalez-Adkins further explained that, although Plaintiff was treated for migraines, they were not caused by black mold:

> Attached hereto as Exhibit B is a true and accurate copy of the May 4-18, 2006 medical records of inmate Morales. He complained of migraine headaches due to a shunt he had in his head. He did not inform me at any time that his headaches were related to the presence of black mold in the Special Housing Unit. In any event, on May 4, 2006, we prescribed Cafergot for his migraines. On May 12, 2006, I saw him and he complained of headaches. We put him on Propanolol as a treatment but needed to monitor his heart rate because it is noted to have a side effect of lowering pulse rate. It worked and he stopped complaining of migraine headaches. On May 18, 2006, he reported he was doing very well and denied headaches or dizziness. On May 18, 2006, he reported he was doing very well and denied headaches or dizziness.

(Adkins-Gonzalez Decl., ¶ 8 (emphasis omitted); see also id., Ex. B.) Plaintiff also did not complain of headaches or respiratory

distress in medical visits on June 13, 2006; July 19, 2006; and August 16, 2006. <u>See</u> <u>supra</u> pp. 7-9.

Because Plaintiff has not come forward with admissible evidence that he was exposed to toxic mold in the SHU or that he suffered any ill effects from any exposure, Plaintiff has not raised a triable issue of fact on the objective element of an Eighth Amendment violation. For that reason alone, Defendants' motion for summary judgment on this issue must be granted.

Plaintiff also has not satisfied the subjective component of an Eighth Amendment violation. First, Plaintiff has not come forward with sufficient evidence to raise a triable issue of fact about whether Defendants actually knew the mold in the SHU contained allergens and was present in sufficient quantities to present an excessive risk to the health of inmates. Defendants have submitted the declaration of Jack Joiner, the Safety Manager at FCI-Memphis, who stated that, "[i]n 2004, we had the SHU tested for the presence of mold. While there was indication of the presence of mold and fungus, it was considered non-toxic." (Joiner Decl., ¶ 3.)[37] In his response to the summary judgment motion, Plaintiff asserts that FCI-Memphis officials were on notice of the presence of toxic mold because of many prisoners suffered from migraines and respiratory distress (D.E. 46 at 37), but he presents no admissible evidence to support that claim. He also does not explain how that

---

[37] Joiner also stated that, although he was aware that Plaintiff or his cell-mate had had a mold sample tested, "[t]here is no way of knowing what he sent out or where it came from and we decided to rely on our own testing." (<u>Id.</u>, ¶ 5.)

evidence would tend to exclude the possibility that prison staff should have known that the mold was a health threat but did not. See supra p. 31.

Even if Plaintiff's evidence were sufficient to raise a triable issue as to whether FCI-Memphis staff knew there was toxic mold in the SHU, Plaintiff has not come forward with evidence that they were deliberately indifferent to the effect of that mold on the health of inmates. Mr. Joiner has stated that, in 2004, the maintenance staff "adopted a plan to clean the SHU on a monthly basis using tilex, bleach, betco peroxide mold cleaner, and a mold inhibitor/enzyme." (Id.) Subsequently, FCI-Memphis staff "contacted a Chemical Cleaning Company" that advised use of an enzyme cleaner. (Id., ¶ 4.) That recommendation was followed. (Id.)

After Plaintiff complained about the mold in his cell, Mr. Joiner states that "we did remove inmate Morales and his cell-mate from the cell, we disinfected it, then sprayed the enzyme. We continued this type of response until the facilities department had funding approved for a new roof and ventilation system." (Id., ¶ 6.) He concludes that, "[s]ince the new roof and ventilation projects in 2006, there have been no further problems with mold." (Id., ¶ 7.)

Thus, Defendants responded to Plaintiff's complaint by removing him from the contaminated cell, disinfecting the cell, and seeking approval for a new roof and new ventilation system to eradicate the conditions that allowed mold to flourish in the SHU. Those major capital improvements were completed in 2006, within six

months of Plaintiff's complaint. Plaintiff has not, therefore, come forward with sufficient evidence to raise a triable issue as to the subjective element of an Eighth Amendment violation.[38]

For all the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment on this claim.

Plaintiff contends that Defendants Franklund, Naimey, and Gonzalez-Adkins were deliberately indifferent to his serious medical needs arising from the June 6, 2008 assault. "The right to adequate medical care is guaranteed to convicted federal prisoners by the Cruel and Unusual Punishments Clause of the Eighth Amendment, and is made applicable to convicted state prisoners and to pretrial detainees (both federal and state) by the Due Process Clause of the Fourteenth Amendment." Johnson v. Karnes, 398 F.3d 868, 873 (6th Cir. 2005). "A prisoner's right to adequate medical care 'is violated when prison doctors or officials are deliberately indifferent to the prisoner's serious medical needs.'" Id. at 874 (quoting Comstock v. McCrary, 273 F.3d 693, 702 (6th Cir. 2001)); see also Blackmore v. Kalamazoo County, 390 F.3d 890, 895 (6th Cir. 2004)("The Eighth Amendment forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference' toward the inmate's serious medical needs. . . . Prison officials' deliberate indifference violates

---

[38]     As previously noted, see supra p. 7 n.14, Plaintiff states in his reply that the expert who tested the mold had concluded that FCI-Memphis staff was "knowingly endangering the lives of prisoners." (D.E. 46 at 17.) The document to which Plaintiff refers is not admissible for the reasons previously stated. Although Plaintiff's submission suggests there may be probative evidence that has not been submitted, it is Plaintiff's responsibility in responding to a motion for summary judgment to produce that evidence. See supra p. 4 n.4.

these rights '[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care . . . ' for a serious medical need.") (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)). "Although the right to adequate medical care does not encompass the right to be diagnosed correctly, [the Sixth Circuit] has 'long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner.'" <u>Johnson</u>, 398 F.3d at 874 (quoting <u>Danese v. Asman</u>, 875 F.2d 1239, 1244 (6th Cir. 1989)).

The objective component of an Eighth Amendment claim based on a failure to provide adequate medical care requires that a prisoner have a serious medical need. <u>Blackmore</u>, 390 F.3d at 896; <u>Brooks</u>, 39 F.3d at 128. This component can be satisfied in two ways. "[A] medical need is objectively serious if it is 'one that has been diagnosed by a physician as mandating treatment <u>or</u> one that is so obvious that even a lay person would readily recognize the necessity for a doctor's attention.'" <u>Blackmore</u>, 390 F.3d at 897 (emphasis in original); <u>see also</u> <u>Johnson</u>, 398 F.3d at 874.

If a prisoner's need for medical attention is not obvious, "the seriousness of a prisoner's medical needs 'may also be decided by the effect of delay in treatment.'" <u>Blackmore</u>, 390 F.3d at 897 (emphasis omitted).[39] Where a prisoner complains about

_____

[39]    The Sixth Circuit elaborated:

These decisions involve prisoner claims of delay in treatment that caused injury, loss, or handicap. . . . Other examples involve
                                                                (continued...)

38

a delay in medical treatment, the Court will "examine the seriousness of a deprivation by examining the effect of the delay in treatment." Napier v. Madison County, Ky., 238 F.3d 739, 742 (6th Cir. 2001). In those cases, "'[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical information in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" Id.; see also Johnson, 398 F.3d at 874.

      The Sixth Circuit has emphasized that

> [t]he "verifying medical evidence" requirement is relevant to those claims involving minor maladies or non-obvious complaints of a serious need for medical care. . . . Napier does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers. Napier applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

Blackmore, 390 F.3d at 898. Where a prisoner's need for medical attention is obvious, "the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or

___

[39]    (...continued)
delayed administration of medication. . . , or a prisoner's refusal to take the prescribed medication . . . , or occasional missed doses of medication . . . , or claims based on a determination by medical personnel that medical treatment was unnecessary. . . . Also within this branch are decisions involving whether the prisoner was treated adequately . . . or whether any delay in providing medical care was harmless . . . , or where the prisoner had a "very minor injury for which many people outside prison would not even think of seeking outside medical treatment."

Id. at 898 (citations omitted).

deteriorated. Instead, it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed within a reasonable time frame." Id. at 900.[40] In those cases, the prisoner may recover for the pain and suffering attributable to the delay. Id. at 899 ("In such cases, the effect of the delay goes to the extent of the injury, not the existence of a serious medical condition. Blackmore was suffering from appendicitis, and it is sufficient that the officers' delay in treatment of an obvious medical emergency posed a substantial risk of serious harm to Blackmore by subjecting him to unnecessary infliction of pain.").

Applying the facts of the instant case to the legal standards, Plaintiff had a serious medical need that was obvious immediately after the June 8, 2006 assault.[41] His wounds were examined by medical staff and determined to be superficial puncture wounds. His wounds were cleaned and bandaged and he received a

---

[40]    See also Garretson, 407 F.3d at 797 ("Here, Garretson is a diabetic whose condition required insulin injections at regulated intervals—a medically required treatment which she did not receive while housed at Madison Heights. As a result of this omission, she was later admitted to the hospital. Even without specific medical records, the emergency hospital admission coupled with a stay of several days satisfies the objective requirement of a 'sufficiently serious' medical need under Farmer and Napier.").

[41]    Curiously, none of the named defendants treated Plaintiff on June 8, 2006. (Franklund Decl., ¶ 7 ("It is also important to note that I did not provide either the immediate or subsequent medical care to inmate Morales. To the extent he complains he did not receive treatment he wanted or thought he should have, I deferred to the medical judgment of the treating medical professionals."); Naimey Decl., ¶ 4 (I was not the treating medical professional [on June 8, 2006]. Rather, as Clinical Director, I reviewed the charts after he received care by other medical professionals at FCI, Memphis.").) Plaintiff was treated by nurses Stewart-Wright and Mason, who are not parties to this action. (Franklund Decl., ¶ 6.) Defendant Naimey may have made the decision not to transport Plaintiff to an outside hospital. (See Naimey Decl., ¶ 5.)

tetanus shot. See supra pp. 5-6. He was also given pain medication. (Naimey Decl., ¶ 6.) Dr. Naimey states that "the puncture wounds were superficial and did not require either transportation to an outside hospital or more than minor first aid." (Naimey Decl., ¶ 5; see also id., ¶ 8 (explaining why sutures were not appropriate).) As previously noted, see supra p. 6 n.10, Plaintiff has not submitted any admissible evidence that the immediate treatment of his injuries was medically inappropriate. Even if he had any evidence, the failure to use stitches on the puncture wounds or to transport Plaintiff to an outside hospital is not actionable under the Eighth Amendment.[42]

Plaintiff also has not raised a triable issue regarding the follow-up care for his physical injuries. Plaintiff was prescribed painkillers. An x-ray was taken on June 15, 2006, which revealed no bone or joint abnormalities. Dr. Naimey also stated that "[t]he results of this x-ray indicated to me that there was no acute internal injury or nerve damage." (Naimey Decl., ¶ 5.) Plaintiff complained of numbness or tingling in his left hand, and he was examined by Dr. Naimey on June 23, 2006 and by Nurse Gonzalez-Adkins on July 20, 2006. See supra pp. 7-8. On July 20, 2006, the Utilization Review Committee approved an EMG on that hand, see supra p. 8, but the test, which had to be done at an outside hospital, could not be scheduled before Plaintiff was transferred. (Naimey Decl., ¶ 6.)

_____

[42]    See Estelle, 429 U.S. at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel or unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court.").

Dr. Naimey also explained why he believed the numbness in Plaintiff's hand was not a sign of nerve damage:

> If inmate Morales had complained about numbness immediately after the incident, I would have likely referred him to an outside consultation much sooner, due to possible nerve damage. However, he did not complain of numbness right away. Following the incident we monitored, provided medication to bring down the swelling and gave antibiotics to avoid infection. Because he did not immediately complain of numbness, and in fact did not complain until June 12, 2006, but this complaint developed over time, this was more than likely due to swelling, especially because he still had use of the hand. As noted on the June 13, 2006 note in his record he had FROM (Full Range of Motion), reflex, good grip and good strength in his hand. These are all indications that he had not suffered nerve damage, at least no damage requiring immediate intervention. He had similar results on June 23, 3006, when he was seen by the Physician's Assistant.

(<u>Id.</u>, ¶ 7.)

Plaintiff has not come forward with admissible evidence that Defendants Franklund, Naimey, and Gonzalez-Adkins were deliberately indifferent to the treatment of his physical symptoms after June 8, 2006. Plaintiff has not submitted verifying medical evidence that he suffered any injury from the delay in ordering an EMG. As previously discussed, <u>see</u> <u>supra</u> p. 8 n.17, Plaintiff's assertion that Dr. Kamel of the Aiken Regional Hospital advised Plaintiff that he had suffered permanent nerve damage because of a delay in performing an EMG is not supported by the document submitted. Moreover, in light of the extensive care that was provided, any disagreement with the medical judgment of Defendants would appear to be, at most, medical malpractice, not deliberate indifference.

42

For all the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment on these claims.

Finally, Plaintiff also has not raised a triable issue regarding the care for his psychological trauma arising from the assault, which was asserted against Defendants Spier and Ennis. In his complaint, which was sworn to under penalty of perjury, Plaintiff asserted that he "was suffering from deep psychological injuries, because he has never been in prison before and he was suffering from outrageous conduct by Defendants." (D.E. 1 at 10.) Specifically, he claims to have experienced "panic attacks, nightmares, and paranoya [sic]." (Id.) The Court will assume, for purposes of this motion, that it was obvious that an inmate who was stabbed by another prisoner, and who experienced the symptoms described in the complaint, would need to be evaluated by a mental health professional. The Court has not concluded that Plaintiff actually suffered serious psychological distress but, rather, that the symptoms described in the complaint, in close proximity to the June 8, 2006, are sufficiently serious to require evaluation.

Plaintiff has not established that he actually suffered from any psychological condition more serious than anxiety. Dr. Spier examined Plaintiff on June 13, 2006 and diagnosed him as suffering from "anxiety":

> I first saw inmate Morales on June 13, 2006. I had him removed from his cell in the Special Housing Unit (SHU) because he had reported to the Institution Duty Officer that he wanted to speak to someone from the Psychology Services Department. .. . During that session, inmate Morales discussed being stabbed the previous week. He informed me that he felt anxiety when he was on the

recreation yard on June 12, 2006, because it was the same area where the June 8, 206 assault occurred. However, he also informed me that he was able to conquer his anxiety and face his fear. Ultimately, he indicated his symptoms of anxiety abated. At that time, I indicated I could bring him some literature regarding anxiety that he could read while in SHU as I found no acute symptoms or concerns requiring immediate attention. Therefore, I noted that routine follow up would be provided.

(Spier Decl., ¶ 5; <u>see also</u> <u>id.</u>, Att. A (notes of 06/13/06 session).) Inmates assigned to the SHU are required to have monthly psychological evaluations, and Dr. Ennis saw Plaintiff on June 29, 2006 and July 28, 2006. (Ennis Dec., ¶¶ 2, 5.) He stated that "[o]n neither of these occasions did he exhibit any acute symptoms." (<u>Id.</u>, ¶ 5.) "In fact, according to [Plaintiff's] own reports during those meetings, he appeared to be coping well with stress." (<u>Id.</u>, ¶ 8.) Dr. Ennis' notes for the June 29, 2006 session stated that "the inmate denied any complaints or concerns. . . . No overt symptoms of mental illness were present at the time of the review." (<u>Id.</u>, Att. A.) The notes of the July 28, 2006 evaluation are similar. (<u>Id.</u>, Att. B.) Finally, the notes of Dr. Spier's session with Plaintiff on August 4, 2006 no not reflect any acute psychological symptoms but, instead, suggest that Plaintiff requested the appointment in the hope of obtaining a recommendation that the destination of his impending transfer be a federal medical facility. (Spier Decl., ¶ 6 & Att. B.) At that time, Dr. Spier observed that Plaintiff's "current psychological needs were not acute."

In his response to the summary judgment motion, Plaintiff asserts that FCI-Memphis staff diagnosed him as suffering from

something called "Post Traumatic Stress Disorder" (D.E. 46 at 20), but he has offered no admissible evidence that any medical professional at FCI-Memphis made such a diagnosis. The documents attached to his response indicate that, on September 25, 2007, Plaintiff reported to an FCI-Edgefield psychologist that "he continues to feel depressed and occasionally hears 'dogs and birds in [his] sleep.'" (<u>Id.</u> at 64 (alteration in original).) Plaintiff had not reported hearing voices while at FCI-Memphis. The psychologist diagnosed him as suffering from "Mood Disorder [Not Otherwise Specified] (expressive anxiety sx, depressive sx, and possible hypomanic sx)" (<u>id.</u> at 64), and stated that he would be evaluated on a quarterly basis (<u>id.</u>). On September 26, 2007, the chief psychologist at FCI-Edgefield administered "a brief intervention for PTSD symptoms" (<u>id.</u> at 63), but those symptoms are not described and the doctor did not offer an opinion that Plaintiff suffered from that condition while at FCI-Memphis. Finally, Plaintiff submitted a redacted copy of the notes of a session with an FCI-Edgefield psychologist on October 11, 2007 (<u>id.</u> at 62), in which he claimed to be experiencing more severe symptoms, but the doctor observed that, when asked about his chief complaints, Plaintiff did not mention any psychological issue. Plaintiff has redacted the portion of those interview notes that include the diagnosis. None of these documents tend to show that

Plaintiff experienced any condition more severe than anxiety while at FCI-Memphis.[43]

Plaintiff has not established a triable issue of fact regarding the subjective component of an Eight Amendment violation. Plaintiff was evaluated by Defendant Spier one week after the assault, and by Defendant Ennis two weeks later. Each psychologist also saw Plaintiff on one other occasion during the Summer of 2006. During each of those sessions, Plaintiff did not appear to be experiencing acute psychological distress. Even if the evaluations of these medical professionals were inaccurate (and Plaintiff has not established that his psychological issues while at FCI-Memphis were more serious than reported), negligence in diagnosing a medical condition does not state an Eighth Amendment claim. Estelle, 429 U.S. at 105-06; see also Sanderfer v. Nichols, 62 F.3d 151, 154 (6th Cir. 1995) ("Deliberate indifference . . . does not include negligence in diagnosing a medical condition."). Finally, as previously noted, see supra pp. 6 & n.12, 8-9, Plaintiff has come forward with no admissible evidence that the book Dr. Spier gave Plaintiff, Anxiety for Dummies, did not appropriately address his psychological issues.

The Court GRANTS Defendants' motion for summary judgment on Plaintiff's claim that Defendants were deliberately indifferent to his serious psychological needs following the June 8, 2006 assault.

---

[43] The notes of the October 11, 2007 session indicate that Plaintiff requested, again, to be transferred to a federal medical center closer to his home in Chicago. (Id.)

Defendants also contends that they are entitled to qualified immunity because Plaintiff has not established the violation of any clearly established constitutional right. (D.E. 41-2 at 29-32.) "Governmental officials performing discretionary functions generally are shielded from liability for civil damages in so far as their conduct does not violate clearly-established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

> A court required to rule upon the qualified immunity issue must consider . . . this threshold question: Taken in the light most favorable to the party asserting the injury, do the alleged facts show the officer's conduct violated a constitutional right? This must be the initial inquiry. . . .
>
> If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity. On the other hand, if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in the specific context of the case, not as a broad general proposition.

Saucier v. Katz, 533 U.S. 194, 201 (2001) (citation omitted). "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brousseau v. Haugen, 543 U.S. 194, 198 (2004); see also Dunigan v. Noble, 390 F.3d 486, 491 (6th Cir. 2004) ("In other words, where a constitutional violation exists, an officer's personal liability turns on the 'objective legal reasonableness' of the action in view of the circumstances the officer confronted assessed in light of

'clearly established' legal rules.") (citing <u>Saucier</u>, 533 U.S. at 201).

In this case, for the reasons previously stated, Plaintiff has not established the existence of any constitutional violation. Although inmates have the right to receive treatment for serious medical and psychological needs and not to be exposed to unreasonably high levels of toxic mold, there is no evidence that Defendants' response to these situations was constitutionally deficient. Finally, Plaintiff has not clearly established constitutional right to a particular security classification or to be assigned to a prison near his home. The Court GRANTS Defendants' motions for summary judgment on the basis of qualified immunity on these claims. The Court declines to address the issue of qualified immunity with respect to all claims that were dismissed pursuant to 42 U.S.C. § 1997e(a).

For all the foregoing reasons, the complaint is DISMISSED WITH PREJUDICE. The Clerk is directed to enter judgment for Defendants. All pending motions are DENIED as moot.

The Court must also consider whether Plaintiff should be allowed to appeal this decision <u>in forma pauperis</u>, should he seek to do so. The United States Court of Appeals requires that all district courts in the circuit determine, in all cases where the appellant seeks to proceed <u>in forma pauperis</u>, whether the appeal is frivolous. <u>Floyd v. United States Postal Serv.</u>, 105 F.3d 274, 277 (6th Cir. 1997). Twenty-eight U.S.C. § 1915(a)(3) provides that

"[a]n appeal may not be taken *in forma pauperis* if the trial court certifies in writing that it is not taken in good faith."

Pursuant to the Federal Rules of Appellate Procedure, a non-prisoner desiring to proceed on appeal *in forma pauperis* must obtain pauper status under Fed. R. App. P. 24(a). See *Callihan v. Schneider*, 178 F.3d 800, 803-04 (6th Cir. 1999). Rule 24(a)(3) provides that, if a party was permitted to proceed *in forma pauperis* in the district court, he may also proceed on appeal *in forma pauperis* without further authorization unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis." If the district court denies pauper status, the party may file a motion to proceed *in forma pauperis* in the Court of Appeals. Fed. R. App. P. 24(a)(4)-(5).

The good faith standard is an objective one. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). The test under 28 U.S.C. § 1915(a) for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any non-frivolous issue. *Id.* at 445-46. The same considerations that led the Court to grant Defendants' motions to dismiss or for summary judgment also compel the conclusion that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith. Leave to proceed on appeal *in forma pauperis* is, therefore, DENIED. If Plaintiff files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed *in forma*

_pauperis_ and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days.

IT IS SO ORDERED this 10th day of October, 2008.


**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE